# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TELESCOPE MEDIA GROUP, *a Minnesota corporation*, and CARL LARSEN and ANGEL LARSEN, *founders and owners of Telescope Media Group*, | Civil No. 16-4094 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| KEVIN LINDSEY, *in his official capacity as Commissioner of the Minnesota Department of Human Rights*, and LORI SWANSON, *in her official capacity as Attorney General of Minnesota*, | |
| Defendants. | |

Jeremy D. Tedesco and Jacob Paul Warner, **ALLIANCE DEFENDING FREEDOM**, 15100 North 90th Street, Scottsdale, AZ 85260, and Renee Carlson, **CARLSON LAW, PLLC**, 855 Village Center Drive, Suite 259, St. Paul, MN 55127, for plaintiffs.

Alethea M. Huyser and Janine Wetzel Kimble, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101, for defendants.

Plaintiffs Carl and Angel Larsen and Telescope Media Group ("TMG")[1] bring a pre-enforcement challenge to the ban on sexual orientation discrimination in public accommodations and contracting in the Minnesota Human Rights Act ("MHRA"). The Larsens operate a videography business, and they plan to expand into the wedding video

---

[1] This Order refers to Plaintiffs collectively as "the Larsens" unless otherwise noted.

business as a public accommodation. They argue that the MHRA's requirement that they serve same-sex couples seeking wedding video services violates the Larsens' First and Fourteenth Amendment rights to free speech, expressive association, free exercise, equal protection, and due process. The Larsens move for a preliminary injunction, seeking an order from the Court preventing enforcement of the MHRA against them in their future wedding video business. Defendants Commissioner of the Minnesota Department of Human Rights Kevin Lindsey ("Commissioner Lindsey"), and Minnesota Attorney General Lori Swanson ("Attorney General Swanson") (collectively "Defendants") move for dismissal for lack of subject-matter jurisdiction and failure to state a claim.

The Court finds that contrary to Defendants' arguments, Attorney General Swanson is not currently entitled to Eleventh Amendment immunity. However, the Court also finds that to the extent the Larsens claim that the MHRA would require them to publicize videos of same-sex weddings online, the Larsens have no standing because the alleged injury-in-fact is too abstract and hypothetical to present a genuine Article III case or controversy. As to the Larsens' claims regarding the MHRA's requirement that they serve same-sex couples in their wedding video business, the Larsens have standing and their claims are ripe. But the Court will dismiss the Larsens' challenges to this application of the MHRA because all of the Larsens' claims fail as a matter of law. Thus, the Court will grant Defendants' motion to dismiss and will deny the Larsens' motion for preliminary injunction as moot.

**BACKGROUND**

## I.     THE MINNESOTA HUMAN RIGHTS ACT (MHRA)

Minnesota has outlawed invidious discrimination in public accommodations since 1885.[2]  While the early antidiscrimination law was aimed at protecting African-Americans from denials of equal opportunity in public accommodations and the "stigmatizing injury" that resulted from such discrimination, the MHRA's scope has "progressively broadened" to outlaw discrimination against a number of historically disadvantaged groups.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624-25 (1984).  The Minnesota Legislature added "sexual orientation" to the list of protected characteristics more than two decades ago.  Act of Apr. 2, 1993, ch. 22, 1993 Minn. Laws 121 (codified as amended at Minn. Stat. §§ 363A.01-363A.44).

Two types of "unfair discriminatory practice" defined in the MHRA are relevant to this case.  First, the Public Accommodations Provision:  "It is an unfair discriminatory practice . . . to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public

---

[2] Minnesota modeled its early antidiscrimination law after the federal Civil Rights Act of 1875, which prohibited discrimination against African-Americans in public accommodations during Reconstruction.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (citing *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws*, 7 N.Y.U. Rev. L. & Soc. Change 215, 238-39 (1975)).  When the Supreme Court invalidated the federal statute in 1883, *see Civil Rights Cases*, 109 U.S. 3 (1883), a number of states, including Minnesota, responded by enacting legislation to accomplish the same goal, *Roberts*, 468 U.S. at 624; *see also* Act of Mar. 7, 1885, ch. 224, § 1, 1885 Minn. Laws 295, 296.  Violation of the law was a misdemeanor, with violators subject to a $100 to $500 fine or imprisonment "not less than thirty (30) days nor more than one (1) year."  Act of Mar. 7, 1885, § 2.

accommodation[3] because of . . . sexual orientation . . . ."   § 363A.11, subd. 1(a)(1).

Second, the Business Discrimination Provision:

> It is an unfair discriminatory practice for a person engaged in a trade or business or in the provision of a service . . . to intentionally refuse to do business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract because of a person's . . . sexual orientation . . . , unless the alleged refusal or discrimination is because of a legitimate business purpose.

§ 363A.17(3).

Commissioner Lindsey leads the Minnesota Department of Human Rights ("MDHR") and is charged with interpreting and enforcing the MHRA's substantive provisions.  *See* § 363A.06.  MDHR investigates allegations of MHRA violations and may pursue administrative enforcement actions to ensure compliance with the MHRA. *See* § 363A.28.  MDHR and private parties may also bring civil actions "seeking redress for an unfair discriminatory practice," § 363A.33, subds. 1, 6, and may pursue declaratory and injunctive relief, monetary damages, and costs and fees, *id.*, subd. 6 (citing § 363A.29, subds. 3-6).  In addition to civil enforcement mechanisms, an unfair discriminatory practice in violation of the MHRA is a misdemeanor.[4]  § 363A.30, subd. 4.

---

3 "Place of public accommodation" is defined as: "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public."  Minn. Stat. § 363A.03, subd. 34.

4 In Minnesota, a "[m]isdemeanor" is "a crime for which a sentence of not more than 90 days or a fine of not more than $1,000, or both, may be imposed."  Minn. Stat. § 609.02, subd. 3.

## II.    LEGALIZATION OF SAME-SEX MARRIAGE

In 2013 Minnesota enacted legislation to legalize same-sex marriage.  Act of May 14, 2013, ch. 74, 2013 Minn. Laws (codified as amended at Minn. Stat. §§ 363A.26, 517.01-23, 518.07).  Subsequently, MDHR publicly announced interpretive guidance for businesses providing wedding-related services, stating:

> [State law] does not exempt individuals, businesses, nonprofits, or the secular business activities of religious entities from non-discrimination laws based on religious beliefs regarding same-sex marriage.
>
> Therefore, a business that provides wedding services such as cake decorating, wedding planning or catering services may not deny services to a same-sex couple based on their sexual orientation.
>
> To do so would violate the protections for sexual orientation laid out in the [MHRA].  The individuals denied services could file a claim with [MDHR] against the entity that discriminated against them.

(First Am. Verified Compl. for Declaratory & Injunctive Relief ("Am. Compl.") ¶ 61, Jan. 13, 2017, Docket No. 13 (quoting Minn. Dep't of Human Rights, *Minnesota's Same-Sex Marriage Law*, https://mn.gov/mdhr/yourrights/who-is-protected/sexual-orientation/ same-sex-marriage/ (last visited Jan. 10, 2017))); *see also id.* ¶¶ 62-64 (citing similar publicly available MDHR guidance).)

## III.    THE LARSENS' BUSINESS

The Larsens are Minnesota residents; they operate TMG, a for-profit Minnesota company incorporated in 2012.  (*Id*. ¶¶ 1, 22-25, 79.)  The Larsens create films and other media for clients.  (*Id.* ¶¶ 80-82, 89.)  The parties do not dispute that because TMG offers

videography services to the general public, it is a "place of public accommodation" as defined in § 363A.03, subd. 34.

The Larsens are Christian. (Am. Compl. ¶¶ 72-78.) In their work at TMG, the Larsens generally exert a large amount of editorial and creative control over the media they produce for clients. (*Id.* ¶¶ 88, 90-91, 100-07.) The Larsens seek to create products that both satisfy their clients' needs and also are consistent with their religious beliefs. (*Id.* ¶¶ 84-85, 89, 93, 109.) The Larsens allege that they will "gladly work with all people" regardless of sexual orientation or religious belief, but they decline requests for their creative services unless "they can use their story-telling talents and editorial control to convey only messages they are comfortable conveying given their religious beliefs." (*Id.* ¶¶ 92, 95.) This means that the Larsens decline requests to work on projects that "promote any conception of marriage other than as a lifelong institution between one man and one woman." (*Id.* ¶ 96.) The Larsens also decline some client requests because they receive more requests than they have capacity to complete. (*Id.* ¶ 98.)

The Larsens allege that they are planning to expand their videography services to include wedding video services with the purpose of "counteract[ing] the current powerful cultural narrative undermining the historic, biblically-orthodox definition of marriage as between one man and one woman" and expressing their opposition to same-sex marriage. (*Id.* ¶ 122; *see also id.* ¶¶ 3-5, 113-21, 123-30, 154-56, 159, 174.) They plan to broadly promote their wedding videos to a broad audience on their website and on "other internet mediums, like Twitter and Facebook," in order "to achieve maximum cultural impact" and to "affect the cultural narrative regarding marriage." (*Id.* ¶¶ 135-36.) The Larsens

allege that "[p]ublic promotion of the wedding videos . . . will be mandatory in every wedding videography contract into which the Larsens enter." (*Id.* ¶ 138.)

The Larsens maintain that the only way that they will be able to achieve their desired expressive goal – to create videos promoting their view of marriage – is if they operate as a provider of wedding video services for paying clients. They argue that (1) "[i]t is not financially feasible . . . to tell stories about marriage with the frequency and quality they desire if they cannot charge for their work"; and (2) "[g]iven the nature of the wedding industry and the fact that weddings are typically not open to the general public, the Larsens would not have access to and be able to capture weddings if couples did not hire them for their weddings." (*Id.* ¶¶ 144, 147.)

The Larsens allege that they are unable to start offering their services "until they know whether they can operate in the wedding industry in accordance with their religious beliefs." (*Id.* ¶ 156.) They claim that if they operate a wedding video service, they will be forced to choose between violating the MHRA – and facing the associated civil and/or criminal consequences – or offering wedding video services to same-sex couples in violation of their religious beliefs. (*See id.* ¶¶ 160-65.) They allege that if they carry out their plan to expand into the wedding video business, they will decline requests to make wedding videos for same-sex couples[5] and will post a statement publicizing this position

---

[5] The Larsens assert that in fact they have already received one request for a wedding video from a same-sex couple even though they do not currently advertise wedding video services. (Am. Compl. ¶¶ 167, 169, 172.)

on their website[6] – acts that the Larsens acknowledge would violate the MHRA's Public Accommodations and/or Business Discrimination Provisions as interpreted by MDHR. (*Id.* ¶¶ 158, 160, 165-66, 168, 170.)  Thus, the Larsens argue the MHRA's prohibition on sexual orientation discrimination is the reason why the Larsens have not expanded into the business of wedding videos.  (*Id.* ¶ 173.)

## IV.  PROCEDURAL HISTORY

On December 6, 2016, the Larsens initiated this action against Defendants in their official capacities. (*Id.* ¶¶ 26, 28-30; *see also* Verified Compl. for Declaratory & Injunctive Relief ¶¶ 26, 28-30, Dec. 6, 2016, Docket No. 1.)  The Larsens assert seven as-applied pre-enforcement constitutional challenges to MHRA's Public Accommodations and Business Discrimination Provisions.  They argue the law impermissibly infringes their First Amendment rights to free speech, expressive association and free exercise; creates an unconstitutional condition on entry into the wedding video market; and violates their Fourteenth Amendment rights to equal protection and to substantive and procedural due process.  (Am. Compl. ¶¶ 194-328.)  The Larsens seek injunctive and declaratory relief excepting them from the MHRA's ban on sexual orientation discrimination, as well as costs and fees pursuant to 42 U.S.C. § 1988.  (*Id.* at 45-46.)

---

[6] The statement the Larsens would like to put on their website is: "Telescope Media Group exists to glorify God through top-quality media production.  Because of TMG's owners' religious beliefs and expressive purposes, it cannot make films promoting any conception of marriage that contradicts its religious beliefs that marriage is between one man and one woman, including films celebrating same-sex marriages."  (Am. Compl. ¶ 158.)

On January 13, 2017, the Larsens filed a motion for preliminary injunction. On February 15, 2017, Defendants filed a motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The Court now considers both motions.

## ANALYSIS

## I.     LACK OF JURISDICTION

The Court first addresses the threshold jurisdictional questions. Defendants make three arguments for dismissal under Rule 12(b)(1): (1) pursuant to the Eleventh Amendment, the Court lacks jurisdiction over the claims against Attorney General Swanson; (2) the Larsens lack standing; and (3) the Larsens' claims are not ripe for review.

### A.     Standard of Review

Federal courts lack jurisdiction over claims against defendants entitled to immunity under the Eleventh Amendment. *E.g.*, *Roe v. Nebraska*, 861 F.3d 785, 789 (8th Cir. 2017) (finding a complaint against state officials entitled to Eleventh Amendment immunity was properly dismissed pursuant to Rule 12(b)(1)). Similarly, if a plaintiff cannot satisfy Article III's case-or-controversy requirements there is no federal subject-matter jurisdiction. *KCCP Tr. v. City of N. Kan. City*, 432 F.3d 897, 899-900 (8th Cir. 2005) (treating a motion to dismiss for lack of ripeness as a Rule 12(b)(1) motion); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) ("[A] standing argument implicates Rule 12(b)(1).").

In a facial attack on jurisdiction under Rule 12(b)(1) such as this, "the court merely [needs] to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (alteration in original) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "Accordingly, 'the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).'" *Id.* (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). "In other words, in a facial challenge, the court 'determine[s] whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint, and drawing all reasonable inferences in favor of the plaintiff.'" *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015) (alteration in original) (quoting *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005)).

## B.    Eleventh Amendment Immunity

"The Eleventh Amendment generally bars suits by private citizens against a state in federal court." *Balogh v. Lombardi*, 816 F.3d 536, 544 (8th Cir. 2016). In *Ex Parte Young*, the Supreme Court articulated an exception to Eleventh Amendment immunity for state officers who "are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature," holding that such officers may be enjoined from taking unconstitutional enforcement action. 209 U.S.123, 156 (1908). "[T]o be amenable for suit challenging a

particular statute the attorney general must have 'some connection with the enforcement of the act.'" *281 Care Comm. v. Arneson* (*281 Care I*), 638 F.3d 621, 632 (8th Cir. 2011) (quoting *Reprod. Health Servs. v. Nixon*, 428 F.3d 1139, 1145-46 (8th Cir. 2005)). In *281 Care I*, the Eighth Circuit found that the *Ex Parte Young* exception applied in a lawsuit challenging a state statute because of the following three connections between the Attorney General and the statute's enforcement:

> (1) the attorney general "may, upon request of the county attorney assigned to a case, become involved in a criminal prosecution of [the challenged statute]," (2) "the attorney general is responsible for defending the decisions of the [state agency to whom enforcement of the challenged statute is delegated]—including decisions pursuant to [the challenged statute]—if they are challenged in civil court," and (3) "the attorney general appears to have the ability to file a civil complaint under [the challenged statute]."

*281 Care Comm. v. Arneson* (*281 Care II*), 766 F.3d 774, 796 (8th Cir. 2014) (quoting *281 Care I*, 638 F.3d at 633).

Here, Attorney General Swanson has the same connections to enforcement of the MHRA as the Attorney General in *281 Care I*. First, she "may, upon request of the county attorney assigned to a case, become involved in a criminal prosecution of" the MHRA. *281 Care I*, 638 F.3d at 632; *see also* Minn. Stat. § 8.01 ("Upon request of the county attorney, the attorney general shall appear in court in such criminal cases as the attorney general deems proper."). Second, Attorney General Swanson "is responsible for defending" MDHR's decisions pursuant to the MHRA if they are challenged in civil court. *281 Care I*, 638 F.3d at 632; *see also* Minn. Stat. § 8.06 ("The attorney general shall act as the attorney for all state officers and all boards or commissions created by law

in all matters pertaining to their official duties."); Minn. Stat. § 363A.32, subd. 1 ("The attorney general shall be the attorney for [MDHR].").  Third, Attorney General Swanson "appears to have the ability to file a civil complaint [for violation of the MHRA], as Minnesota law gives the attorney general broad discretion to commence civil actions, *see* Minn. Stat. § 8.01, and [§ 363A.33] allows any person . . . to file a civil complaint." *281 Care I*, 638 F.3d at 632.

The Court is bound by the Eighth Circuit's holding in *281 Care I*.  Therefore, the Court has jurisdiction over the claims for injunctive relief against Attorney General Swanson under *Ex Parte Young*.

## C.      Justiciability

Defendants argue the Court should grant the motion to dismiss on two justiciability grounds, specifically the Larsens lack standing and their claims are not ripe. To evaluate justiciability, the Court distinguishes between two separate alleged injuries. First, the Larsens allege that if they sell wedding video services to the public, the MHRA's requirement that they serve same-sex couples, effectively requiring them to create videos of same-sex weddings, would violate the Larsens' constitutional rights.[7] Second, the Larsens allege that "public promotion of the wedding videos [created by TMG] will be mandatory in every wedding videography contract into which the Larsens enter."  (Am. Compl. ¶ 138).  Based on this allegation, the Larsens claim the following:

---

[7] The Larsens allege both the Public Accommodations and Business Discrimination Provisions would compel them to serve same-sex couples.

The Larsens want to create films that will be played at weddings, published on their website, and shared via social media to tell a story of love, commitment, and vision for the future that encourages viewers to see biblical marriage as the sacred covenant God designed it to be. But if they do so, Defendants require that they also tell stories promoting other types of marriage, including same-sex marriage, in the same way and through the same channels.

(Pls.' Opp. to Defs.' Mot. to Dismiss ("Pls.' Opp.") at 28, Mar. 8, 2017, Docket No. 40 (citations omitted).) The Larsens argue that if they structure their wedding video contracts as planned – in a manner that contractually obligates them to post **all** TMG wedding videos online – the Larsens would be unconstitutionally compelled to post videos of same-sex weddings online by operation of the Business Discrimination Provision.

## 1.    Standing

"Whether a plaintiff has standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 731 (8th Cir. 2005) (quoting *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000)). "The 'irreducible constitutional minimum of standing' is that a plaintiff show (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The alleged injury-in-fact must be "(a) concrete and particularized" and "(b) 'actual or imminent,'" as opposed to "'conjectural' or 'hypothetical.'" *Lujan*, 504

U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "A party invoking federal jurisdiction has the burden of establishing standing 'for each type of relief sought.'" *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

In the First Amendment context, "two types of injuries may confer Article III standing to seek prospective relief." *Id.* at 794 (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). First, the Larsens could establish an imminent threat of harm sufficient to confer standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A plaintiff in such a situation is "not . . . required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

Second, "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Thus, self-censorship in the face of a credible threat of future prosecution or civil enforcement constitutes an ongoing injury-in-fact sufficient to confer Article III standing. *Klahr*, 830 F.3d at 794 (discussing a "chilling effect" due to "a credible threat of future [criminal] prosecution" (quoting *Ward*, 321 F.3d at 1267)); *see also 281 Care I*, 638 F.3d at 630 ("[N]on-criminal consequences contemplated by a challenged statute can also contribute to the objective reasonableness

of alleged chill.").  But self-censorship founded on alleged subjective chill caused by a statute is not enough to support standing, and "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs."  *281 Care I*, 638 F.3d at 627 (quoting *Babbitt*, 442 U.S. at 298).

Defendants argue that the Larsens have not alleged an injury-in-fact.[8]

### a.      Making Wedding Videos for Same-Sex Couples

First, the Court examines the Larsens' desire to sell wedding video services to the public, yet refuse to serve same-sex couples.  Here, the Larsens allege both types of injuries courts have found sufficient to establish standing in pre-enforcement First Amendment challenges, as articulated in *Klahr*.  First, the Larsens allege plans to operate TMG as a public accommodation in a manner that would clearly violate the Public Accommodations and Business Discrimination Provisions because they would decline to

---

[8] Defendants briefly argue that the causation element of standing is not met as to claims against Attorney General Swanson because "[w]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision."  *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015); *accord Balogh*, 816 F.3d at 543.  But Attorney General Swanson does have authority to enforce the MHRA, as explained above, unlike the challenged statutes in *Digital Recognition Network* and *Balogh*.  *Dig. Recognition Network*, 803 F.3d at 958 (explaining that the challenged statute "provide[d] for enforcement only through private actions"); *accord Balogh*, 816 F.3d at 540, 543.

Otherwise, Defendants do not argue the Larsens have failed to demonstrate Article III's causation and redressability requirements.  Further, the Court finds those requirements are easily met regarding the Larsens' claim that the MHRA would compel them to serve same-sex couples if they operated a wedding video business selling services to the public

serve same-sex couples.[9]  (Am. Compl. ¶¶ 158, 167-68.)  The Larsens allege that at least one same-sex couple already requested that TMG produce their wedding video, (*id.* ¶ 169), only increasing the likelihood that, if they did expand into the wedding video business, they would end up turning away same-sex couples in violation of the MHRA. The Larsens also colorably argue that the operation of the statute would violate their constitutional rights; for purposes of evaluating standing, the Larsens "need[] only to establish that [they] would like to engage in **arguably** protected speech."  *281 Care I*, 638 F.3d at 627 (emphasis added).

The Larsens also allege a credible threat of enforcement, contrary to Defendants' argument that the Larsens have asserted only a hypothetical injury-in-fact based on

---

[9] The Larsens argue that their plan to decline to serve same-sex customers is not "because of" those customers' sexual orientation at all, but rather, "because of" objection to the message conveyed in the videos.  Thus, they argue that while MDHR would interpret the MHRA to apply to the Larsens' wedding video business, that interpretation is incorrect.

The Court does not find semantic distinctions about the reason for refusing service to be particularly useful.  When the message of the speech-for-hire necessarily varies based on the customer's protected characteristic, such a refusal is at least in part "because of" the customer's protected status, even if the decision is also "because of" an objection to the message of the expressive product that will be created as a result of serving the customer with the "objectionable" characteristic.  The MHRA clearly reaches such conduct. *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Ca., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 672, 689 (2010) (determining that excluding LGBT students from a student group because of their "unrepentant homosexual conduct" was, in effect, discrimination based on sexual orientation and not simply exclusion because of conduct or viewpoint); *cf. Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination.");  *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

"[s]ubjective concern about how [the MHRA] might apply." (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 6, Feb. 15, 2017, Docket No. 34.) MDHR's interpretation of the statute's application to wedding vendors is clear. *See* Minn. Dep't of Human Rights, *Minnesota's Same-Sex Marriage Law*, https://mn.gov/mdhr/yourrights /who-is-protected/sexual-orientation/same-sex-marriage/ (last visited Aug. 8, 2017). And the Larsens allege MDHR took enforcement actions against a wedding vendor very recently – in 2014 – after sending testers to investigate business's practices. (Am. Compl. ¶¶ 43-47, 66-71, 164-65.) To the extent Defendants argue there is no credible threat of enforcement simply because there is no telling at this time whether they would ever decide to exercise their enforcement discretion against the Larsens, courts have found that speculation as to whether an entity charged with enforcement will actually choose to enforce a law against a plaintiff does not defeat standing. *See, e.g.*, *281 Care I*, 638 F.3d at 627-31. "We assume [MDHR] would prosecute violators of [the MHRA], given the opportunity, because it has vigorously defended the [statute] and has never suggested that it would refrain from enforcement." *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1217 (8th Cir. 1998). Thus, the Larsens have alleged an imminent, non-hypothetical injury-in-fact based on their plan to engage in conduct proscribed by statute – refusing to serve same-sex couples when operating as a public accommodation providing wedding video services – coupled with a credible threat of prosecution.

Second, the Larsens allege First Amendment chilling based on the notion that their wedding video business would arguably involve exercise of their First Amendment rights, but they have refrained from offering their expressive business services in the

wedding field because, if they did so, they would operate in a way that violates the MHRA. (Am. Compl. ¶¶ 154-74.) The Court finds that because there is a credible threat of enforcement, the Larsens' "decision to chill [their activities] in light of the [MHRA is] 'objectively reasonable.'" *281 Care II*, 766 F.3d at 780-81 (quoting *281 Care I*, 638 F.3d at 627). Therefore, the Larsens have alleged self-censorship sufficient to establish standing regarding their claim that the MHRA would unconstitutionally force them to create videos of same-sex weddings if they operated as a wedding video services public accommodation.

### b. Publicizing Videos of Same-Sex Weddings

Next the Court considers whether the Larsens have standing to challenge the validity of the Business Discrimination Provision's ban on "discriminat[ion] in the basic terms, conditions, or performance of the contract because of a person's . . . sexual orientation," § 363A.17(3), as applied to the Larsens' allegation that they will write contracts that mandate them to publicize **all** TMG wedding videos online. The Court concludes that, as for this aspect of the Larsens' pre-enforcement challenge, the Larsens have failed to satisfy Article III's injury-in-fact requirement because: (1) they failed to allege an intention to engage in a course of conduct proscribed by statute; (2) they failed to demonstrate a credible threat of enforcement; and (3) any First Amendment chilling is unreasonable.

First, it is not clear that the Larsens have alleged an intention to engage in a course of conduct[10] that is proscribed by statute. *See Klahr*, 830 F.3d at 794. The Business Discrimination Provision bars sexual orientation discrimination in "the basic terms, conditions, or performance of [a] contract" by a person engaged in a trade, business, or the provision of services. § 363A.17(3). The most plausible reading of the phrase "basic terms" is that it refers to the elements of a contract that make up the core of the deal, or in other words, terms that are necessary in order to make the contract enforceable.[11] For

---

[10] The Court does not doubt the genuineness of the Larsens' religious objections to same-sex marriage. For this reason, it seems truly incredible that the Larsens would voluntarily structure a contract to obligate themselves to publicize videos of same-sex weddings and to adopt those videos as their own personal speech. *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) (Souter, J., dissenting) (explaining that under the Rule 12(b)(6) standard, "a court must take the allegations [in a complaint] as true, no matter how skeptical the court may be," with "[t]he sole exception" arising when the allegations are "sufficiently fantastic to defy reality as we know it"). In the Court's view, the plan to structure contracts in a manner that obligates the Larsens to publicize these videos is a creative lawyer's attempt to bring the facts of this case closer in line with the facts in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995).

Nevertheless, the Court recognizes that pleadings may contain alternative arguments, "regardless of consistency." Fed. R. Civ. P. 8(d)(3). The Court, therefore, takes caution to construe the pleadings in the non-moving party's favor, given that Defendants only raise facial challenges to jurisdiction. As such, the Court will overlook this fundamental inconsistency in the Amended Complaint and will accept the Larsens' alleged plans as true for purposes of the motion to dismiss.

[11] *See, e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995) (referring to the "basic terms" of a contract to include "price, service, [and] credit," and not including an arbitration clause); *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir. 2008) (explaining that under Wisconsin law, the "basic terms and requirements" of a contract are those that are required to make a contract enforceable, including "the essential commitments and the obligations of each party" (quoting *Witt v. Realist, Inc.*, 118 N.W.2d 85, 93 (Wis. 1962)); *Meier v. Wall to Wall Media, LLC*, No. A11-2225, 2012 WL 2079869, at *1 (Minn. Ct. App. June 11, 2012) (explaining that the "basic terms" of an employment contract included "a job description, salary, bonus and incentives plan, and description of benefits").

example, price and services offered are "basic terms" of a contract for the sale of services, so the Larsens would be barred from **charging a higher price** or **declining to provide certain services** because of a customer's sexual orientation.

Additionally, the purpose of the Business Discrimination Provision is to shield people in protected classes from invidious discrimination that prevents them from benefiting from contracts on equal terms as everyone else.[12] But a mandatory requirement that the Larsens post all wedding videos online and adopt them as the Larsens' own speech is not a provision that benefits customers. The allegations in the Amended Complaint demonstrate that the Larsens' plan to post wedding videos online is meant to fulfill their own personal goal of communicating with the public about their religious beliefs. (*E.g.*, Am. Compl. ¶¶ 135-38 (stating that the Larsens plan to promote wedding videos "proclaiming God's design for marriage . . . to a broader audience to achieve maximum cultural impact," including, for example, publishing the videos online, and stating that such public promotion "will be mandatory in every wedding videography contract").) Thus, a contractual provision obligating the Larsens to post wedding videos online – a term wholly unrelated to any consideration exchanged in the contract or any

---

[12] *See* § 363A.02, subd. 1 (stating that "[i]t is the public policy of [Minnesota] to secure for persons in this state, freedom from discrimination," and explaining that "[s]uch discrimination threatens the rights and privileges of the inhabitants of this state"); § 363A.04 ("The provisions of this chapter shall be construed liberally **for the accomplishment of the purposes thereof.**" (emphasis added)).

benefit provided to the customer – is not a "basic term" as contemplated by the Business Discrimination Provision.[13]

Second, there is no credible threat of prosecution or civil enforcement. This is due, in part, to the low likelihood that MDHR would interpret the MHRA in line with the Larsens' minimally colorable reading of the statute.[14] Furthermore, Defendants' counsel made clear at the hearing that Defendants – charged with interpreting and enforcing the statute – do not believe the MHRA would require the Larsens to post videos of same-sex weddings online. (Tr. of Mots. Hr'g at 25:21-24, June 16, 2017, Docket No. 52

---

[13] This planned course of conduct also would likely not violate the Public Accommodations Provision, which prohibits denial of "any person['s] full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of . . . sexual orientation . . . ." § 363A.11, subd. 1(a)(1). The posting of videos online is not a service that the Larsens would be selling as a public accommodation; instead, they would be selling the service of creating a wedding video and the physical item that is the finished product – the video itself. Thus, refusing to post videos of same-sex weddings on TMG's website would not deprive same-sex customers of "full and equal enjoyment of" TMG's goods and services.

[14] The Larsens repeatedly compare their case to *Hurley*. The *Hurley* court considered an as-applied challenge to the operation of the Massachusetts public accommodations law that resulted in the state requiring parade organizers to permit an LGBT group to carry a banner in a privately-organized parade. 515 U.S. at 559-63. The Supreme Court noted that the application of the public accommodations law to the activities of a private parade organizer was "peculiar" because it meant that the parade organizer's speech itself (organizing the parade) was considered a public accommodation. *Id.* at 572-73. Interpreting the MHRA to restrict the Larsens' speech online would likely be a similarly "peculiar" application of a public accommodations law. But unlike the case at hand, *Hurley* did not involve a pre-enforcement challenge. Given the "peculiar" nature of the state's application of the statute in *Hurley*, the Court doubts that there would have been standing for the parade organizers to challenge the antidiscrimination law prior to enforcement in lieu of some indication that Massachusetts considered their actions a violation of the law or was considering taking enforcement action against them. The same is true in this case; the Court declines to hypothesize that MDHR would interpret the MHRA in an unlikely, "peculiar" way absent some indication that they are actually considering doing so.

(explaining that what videos the Larsens post online "would be utterly and completely within [the Larsens'] control and discretion").)[15]  Additionally, the Larsens have not alleged a history of enforcement or any allegations showing MDHR agrees with their reading of the Business Discrimination Provision.

The fear that MDHR would ever take enforcement action against the Larsens for refusing to post videos of same-sex weddings online is "imaginary or speculative." *Younger v. Harris*, 401 U.S. 37, 42 (1971).  Thus, because the Larsens "do not claim that they have ever been threatened with prosecution [or civil enforcement], that a prosecution [or civil enforcement action] is likely, or even that a prosecution [or civil enforcement action] is remotely possible," *id.*, in relation to their plan not to post videos of same-sex weddings online, "they do not allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 299.[16]

---

[15] At times in the hearing, the Larsens' counsel also appeared to concede that the MHRA would not compel the Larsens to post videos of same-sex weddings online.  (*E.g.*, Tr. of Mots. Hr'g at 10:22-11:2 ("THE COURT: But would the State require [the Larsens] . . . to place every video online even if they had the contractual right to do that?  [THE LARSENS' COUNSEL]: The State is not requiring them to do that.  They're choosing to do that, and they have a constitutional right to do that.").)

[16] Just as the Court finds there is no credible threat of an enforcement action based on the Larsens' refusal to post videos of same-sex weddings online, the Court also finds that any chilling of exercise of constitutional rights based on a fear of enforcement is unreasonable. *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009) ("[T]he 'chilling' effect of exercising a First Amendment right must be objectively reasonable."); *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004) ("A plaintiff suffers from an objectively reasonable chilling of his First Amendment right to free expression by a criminal statute only if there exists a credible threat of prosecution under that statute if the plaintiff actually engages in the prohibited expression.").

## 2.     Ripeness

Defendants also argue the Larsens' claims are not ripe.[17]  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).   The doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).   "It requires that before a federal court may address itself to a question, there must exist 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'"  *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1037-38 (8th Cir. 2000) (quoting *Babbitt*, 442 U.S. at 298).

To show that a case is ripe, a plaintiff must satisfy both of the following two prongs "to at least a minimal degree": (1) the issues presented are "fit[ ] for judicial resolution," and (2) "significant harm" to the parties would result if the court withholds consideration.  *Id.* at 1038-39.  The first prong "depends on whether [a case] would benefit from further factual development," with ripeness "more likely . . . if [the case] poses a purely legal question and is not contingent on future possibilities."  *Pub. Water*

---

[17] Since the Larsens lack standing regarding injuries tied to the plan to publicize videos online, the Court restricts its ripeness discussion to the Larsens' allegation that the MHRA would compel them to serve same-sex couples.

*Supply Dist. No. 10 of Cass Cty. v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003).

With respect to the second prong, "[a]bstract injury is not enough. It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Id.* (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Under the first prong, Defendants assert that the Larsens' claims are not ripe because "there is uncertainty regarding how [MDHR] would apply [the MHRA] in particular circumstances." (Defs.' Mem. at 6.) To support this argument, Defendants cite *Texas*, in which the Supreme Court dismissed a case as unripe in dramatically different circumstances. There, Texas sought a declaration that potential sanctions for failing school districts under a comprehensive state statutory scheme to improve public schools categorically did not violate the Voting Rights Act. 523 U.S. at 297-99. The Supreme Court held that the inquiry into how Texas might interpret and apply the legislation was "too remote and abstract" in the absence of a concrete case. *Id.* at 301 (quoting *Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954)). Whether such a case might ever arise was "contingent on a number of factors," and Texas's manner of implementing the legislation was not yet clear. *Id.* at 300-01.

Considering the Larsens' allegation that the MHRA would require that they serve same-sex couples in their future wedding video business, the issues presented are fit for judicial decision. Unlike the unimplemented legislation at issue in *Texas*, here the Court considers a long-standing, already-implemented antidiscrimination statute. State agencies regularly apply statutes of this type and courts regularly review them. *See, e.g.*,

*Roberts*, 468 U.S. 609 (reviewing Minnesota's application of a previous version of the MHRA); *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn. 1985) (same). There is a record of past state enforcement actions, as well as explicit interpretive guidance from MDHR indicating that the Larsens' planned conduct would violate the MHRA. And unlike the abstract future injury in *Texas*, the Larsens allege both imminent and ongoing injuries that do not rest on any hypothetical contingencies, as discussed above. Defendants do not explain how the Court's deliberations would "benefit from further factual development." *City of Peculiar*, 345 F.3d at 573. Legal questions regarding undisputed facts are at the core of this dispute, and thus, the issues presented are fit for judicial decision.

Moving to the second prong, Defendants argue that the Larsens' alleged future injuries are so speculative that no hardship would result if the Court withheld consideration. But as discussed above, the Larsens allege both ongoing injury (chilling) and imminent injury (enforcement if they engage in their intended course of conduct). Courts have rejected ripeness arguments in similar pre-enforcement contexts when there is an allegation of ongoing chilling. *See, e.g.*, *281 Care I*, 638 F.3d at 631. Therefore, the Larsens have satisfied the second prong as to their plan to decline providing wedding video services to same-sex couples if they operate a wedding video business as a public accommodation.

To summarize, the Court finds that Attorney General Swanson is not currently entitled to Eleventh Amendment immunity. However, the Larsens' claim that the MHRA would force them to post same-sex wedding videos online is not justiciable because there

is no injury-in-fact.[18]  The Court will reject Defendants' standing and ripeness challenges to the Larsens' claim that they will be unconstitutionally required to serve same-sex couples by creating videos of same-sex weddings if they operate a wedding video business as a public accommodation; the following discussion of Defendants' Rule 12(b)(6) motion addresses this alleged injury only.

## II.      FAILURE TO STATE A CLAIM

### A.      Standard of Review

In reviewing a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint "state[s] a claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although

---

[18] Even if there were standing to challenge the application of the MHRA to the Larsens' decision not to post same-sex wedding videos online, the issue would not be ripe.  First, a challenge to that alleged application of the statute is not fit for adjudication because, given the lack of a credible threat of enforcement, "we have no idea whether or when [an enforcement action] will be ordered."  *Texas*, 523 U.S. at 300 (quoting *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967)).  The idea that MDHR might interpret the MHRA to compel the Larsens to post certain videos online is simply too remote and abstract a possibility to make the issue fit for judicial review.  Second, the Larsens have an obvious, easy way to avoid hardship – the terms of their contracts are within their control, and state law does not compel them to contractually obligate themselves to post videos of same-sex weddings online.  *See id.* at 301 (finding there was no hardship sufficient to satisfy the second ripeness prong when "inconvenience [was] avoidable").

the Court accepts a complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557). "In addressing a motion to dismiss, '[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.'" *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

### B.    Count I: Free Speech

The First Amendment, as applied to states through the Due Process Clause of the Fourteenth Amendment, prohibits states from making laws "abridging the freedom of speech." U.S. Const. amends. I, XIV; *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). The Larsens allege that the Public Accommodations and Business Discrimination Provisions, as applied to the Larsens' wedding video business, violate the Free Speech Clause in three ways, including that the law: (1) is a direct regulation of "pure speech" that is not content- or viewpoint-neutral and fails strict scrutiny; (2) unconstitutionally compels speech and fails strict scrutiny; and (3) imposes an unconstitutional prior

restraint on speech because officials have unbridled enforcement discretion. Defendants move to dismiss the free speech claims, arguing that the Larsens' claims fail as a matter of law because the MHRA is a content-neutral regulation of conduct, it does not compel speech, and it is not a prior restraint. Defendants also argue that even if the MHRA is content-based or compels speech, it survives strict scrutiny because it is narrowly tailored to serve a compelling government interest.

### 1. Whether the MHRA Unconstitutionally Burdens Free Speech as a Content-Based Regulation

The Court first addresses the Larsens' argument that the MHRA, as applied, violates their First Amendment rights because it is not content- or viewpoint-neutral and fails strict scrutiny. When a law regulating speech is content-based, it is "presumptively unconstitutional and may be justified only if" it survives strict scrutiny – that is, the law is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). A law regulating speech is content-based if (1) "'on its face' [it] draws distinctions based on the message a speaker conveys," *id.* at 2227 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)); (2) it is facially content-neutral but "cannot be 'justified without reference to the content of the regulated speech'" *id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); or (3) it was "adopted by the government 'because of disagreement with the message [the speech] conveys,'" *id.* (alteration in original) (quoting *Rock Against Racism*, 491 U.S. at 791).

Content-neutral laws affecting speech and expression are generally subject only to intermediate scrutiny. For example, "'content-neutral' time, place, and manner

regulations [of speech] are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). A similar form of intermediate scrutiny applies when a content-neutral law incidentally affects speech or inherently expressive conduct. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (noting the analysis "is little, if any, different").

In *United States v. O'Brien*, the Supreme Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." 391 U.S. 367, 376 (1968); *see also Sorrell*, 564 U.S. at 567 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). Such a regulation will be upheld "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (quoting *O'Brien*, 391 U.S. at 377); *cf. Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 578 (1995) (holding a law regulating the content of a parade was unconstitutional when it "simply . . . require[d] speakers to modify the content of their expression . . . . **in the absence of some further, legitimate end**" (emphasis added)). "[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a

substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985).

But laws that regulate conduct that is, in part, effectuated through language (or some other medium of exercising expression) are generally considered regulations of conduct that do not pose a First Amendment issue at all. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct . . . ."). "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see also, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 62 (2006) ("The fact that [a law barring racial discrimination in hiring] will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.").

### a.     The Proper Level of Scrutiny in This Case

As an initial matter, the Larsens plan to post language on their website stating that they will not create wedding videos for same-sex couples. To the extent the Larsens argue such a statement is protected by the First Amendment, and thus the operation of the MHRA would unconstitutionally curtail such speech, the Court finds there is no constitutional problem. While carried out through language, the statement is conduct akin to a "White Applicants Only" sign that may be prohibited without implicating the

First Amendment. *See Rumsfeld*, 547 U.S. at 62. Posting language on a website telling potential customers that a business will discriminate based on sexual orientation is part of the act of sexual orientation discrimination itself; as conduct carried out through language, this act is not protected by the First Amendment. *Id.*; *see also Giboney*, 336 U.S. at 690-91.

The Court next considers the Larsens' argument that the MHRA would unconstitutionally burden their free-speech rights because, as applied, the law affects the content of the Larsens' wedding videos.[19] It is an unremarkable proposition that films are First Amendment-protected speech, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499-502 (1952), and that creating films involves exercise of First Amendment rights, *see Sorrell*, 564 U.S. at 570 ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). The Court assumes for purposes of this motion that the creation and contents of the Larsens' speech-for-hire implicate the Larsens' First Amendment rights.[20] But the Larsens are not immune from generally-

---

[19] The Court rejects Defendants' argument that the Larsens' wedding videos are commercial speech. The videos are wholly unlike advertisements "proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980); *see also id.* at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising."); *Sorrell*, 564 U.S. at 579 ("[T]he government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'" (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993))).

[20] The Court recognizes there is an argument that while the wedding videos are entitled to First Amendment protection, the customer, as opposed to the videographer, is the "speaker" whose speech rights are implicated. The Court need not resolve that potential issue at this time

(Footnote continued on next page.)

applicable or commerce-oriented business regulations simply because they are engaged in First Amendment-protected expression. *See Sorrell*, 564 U.S. at 567 ("[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."); *cf. Turner*, 512 U.S. at 626, 668 (applying intermediate scrutiny to a law requiring cable operators to save a certain number of channels for local broadcasters even though cable operators engage in First Amendment speech, and remanding to determine whether the law was narrowly tailored as required by the *O'Brien* test); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (finding that while lawyers "make a 'distinctive contribution . . . to the ideas and beliefs of our society,'" Title VII's ban on sex discrimination in hiring and promotions did not unconstitutionally infringe upon a law firm's exercise of First Amendment free expression (alteration in original) (quoting *NAACP v. Button*, 371 U.S. 415, 431 (1963))). Nonetheless, the Court recognizes that the application of the MHRA to expressive businesses may at certain limited times burden the business's exercise of free expression, and the case at hand is one such situation.[21] Therefore, the proper level of scrutiny depends on whether the MHRA is content-based or content-neutral. *Turner*, 512 U.S. at 641-43.

_____
(Footnote continued.)

and assumes the Larsens, as videographers, exercise their First Amendment rights when they create wedding videos for customers.

[21] The Larsens argue that the MHRA, as interpreted by MDHR, would require all public accommodations offering speech-for-hire to create expressive work even if they disagree with the message conveyed; the Court disagrees with this reading of the statute. For example, the Court does not understand the statute to mean that a ghost-writer operating as a public

(Footnote continued on next page.)

The Court concludes that the MHRA is content-neutral. First, the law does not facially "target speech based on its communicative content." *See Reed*, 135 S. Ct. at 2226. The MHRA is a generally-applicable business regulation; the statute applies to all public accommodations and all businesses engaged in the provision of a service, outlawing discrimination against customers or prospective customers on the basis of a protected status. §§ 363A.11, 363A.17. Furthermore, on its face, the MHRA regulates non-expressive conduct – the act of selecting and serving customers – and does not target speech or expression at all. *Roberts*, 468 U.S. at 623-24; *see also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (noting that Title VII, which prohibits discrimination in employment, is "a permissible content-neutral regulation of conduct").

_____

(Footnote continued.)

accommodation would be prohibited from turning down a request to write a book when the writer disagrees with the message the book would convey. This is true even if the book would be on a topic related to a protected status. Thus, a writer personally opposed to same-sex marriage could decline to ghost-write a book detailing the societal benefits of same-sex marriage if that refusal is genuinely based on an objection to the book's message. A customer of any sexual orientation could request such a book. Absent evidence demonstrating discrimination based on the customer's protected status, the reason for declining the book deal would be "because of" the message of the book, not "because of" the sexual orientation of the customer.

In contrast, the context of expressive businesses depicting marriage is one of just a handful of rare circumstances where public accommodations laws, as routinely applied, will impose burdens on First Amendment expression. Only in a narrow range of situations will the protected status of the customer be inextricably linked with the content of the expressive product – the fact that a hypothetical customer would be a man marrying another man means that the wedding video would necessarily depict a wedding of a man marrying another man. *See Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013), *cert. denied*, 134 S. Ct. 1787 (2014) ("[W]hen a law prohibits discrimination on the basis of sexual orientation, that law similarly protects conduct that is inextricably tied to sexual orientation."). Another example would be a videographer or photographer opposed to interracial marriage who is hired to document an interracial marriage or photograph an interracial family.

Second, the law is not the type of statute that, though facially content-neutral, "cannot be 'justified without reference to the content of the regulated speech.'" *Reed*, 135 S. Ct. at 2227 (quoting *Rock Against Racism*, 491 U.S. at 791). The law applies to all public accommodations and businesses selling services regardless of the type of product or service sold. This includes all public accommodations selling expressive services to the public, regardless of the message expressed.[22]

Third, the MHRA bans discrimination against customers as a way to combat invidious discrimination, not because the government "disagree[s] with the message" any expressive service might convey. *Reed*, 135 S. Ct. at 2227 (quoting *Rock Against Racism*, 491 U.S. at 791); *see* § 363A.02, subd. 1 ("It is the public policy of this state to secure for persons in this state, freedom from discrimination . . . in public accommodations because of . . . sexual orientation . . . ."). "[A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—

---

[22] The Larsens argue that "whether the MHRA applies depends on the content of the Larsens' films," noting that the law would not "require the Larsens to create films promoting the election of any Minnesota politician they dislike because political affiliation is not protected by the MHRA." (Pls.' Opp. at 29.) But the Larsens misunderstand how the MHRA operates – it applies equally to public accommodation videographers creating wedding videos, political videos, or any other type of videos. A political candidate seeking a campaign video could not be lawfully turned away because of her race or sexual orientation, just as a couple looking to purchase wedding video services could not be lawfully turned away because of their race or sexual orientation. Thus, whether the law applies to an expressive business operating as a public accommodation clearly does not depend on "the content of the regulated speech," as the law applies to all such businesses. *Reed*, 135 S. Ct. at 2227 (quoting *Rock Against Racism*, 491 U.S. at 791).

wholly apart from the point of view such conduct may transmit." *Roberts*, 468 U.S. at 628.

The Larsens argue that the MHRA would not compel a wedding videographer supportive of same-sex marriage to create a video critical of same-sex marriage, and thus, the law is viewpoint-based. But this comparison is inapt, as Court cannot imagine any situation in which the MHRA would compel a wedding videographer to make a wedding video critical of **any** marriage. It would, however, compel a wedding videographer hostile to opposite-sex marriage to serve opposite-sex couples, which would incidentally require them to create videos depicting opposite-sex weddings. Thus, as applied to wedding videographers, the law incidentally requires creation of wedding videos for all customers regardless of the customers' protected status or the message depicted in the resulting videos. The law also does not prohibit the creation of any videos, and thus does not "raise[] the specter that [Minnesota] may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Contrary to the Larsens' assertions, the MHRA does not amount to a state effort to stamp out expression opposing same-sex marriage or to privilege only pro-same-sex marriage views.[23]

---

[23] The Larsens allege that the "MHRA is preventing [them] from celebrating and promoting their religious views about marriage." (Am. Compl. ¶ 187.) The Court considers this a legal conclusion couched as a factual allegation, and finds the legal conclusion untenable. The MHRA does not prevent the Larsens from speaking out as widely as they please against same-sex marriage.

(Footnote continued on next page.)

It is a "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989); the MHRA, both facially and as applied to the Larsens, simply does not implicate this fundamental First Amendment concern. As a content-neutral law regulating conduct, strict scrutiny is not the proper standard for evaluating the MHRA as applied to the Larsens' wedding video business.

_____

(Footnote continued.)

The MHRA does not prevent the Larsens from speaking against same-sex marriage simply because it regulates – in a manner to which the Larsens object– activity that the Larsens plan to rely on to fund their speech. (*See* Am. Compl. ¶ 144 ("It is not financially feasible for the Larsens to tell stories about marriage with the frequency and quality they desire if they cannot charge for their work.").) While the Larsens have a right to engage in such speech, they do not have a right to fund that speech through business activities for profit beyond the reach of otherwise valid regulation. *Cf. Regan v. Taxation Without Representation of Wash.*, 461 U.S. 540, 546 (1983) ("We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the state.'" (quoting *Cammarano v. United States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring))).

Additionally, it may be true that the Larsens would not have access to as many private weddings as they would like if they did not sell wedding video services to the public, and in turn, they might not be able to speak against same-sex marriage in the way that desire without selling wedding video services. While some Circuits have recognized a right to film government activities, *see Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (holding the First Amendment protects an individual recording police activity in public); *Reed v. Lieurance*, __ F.3d __, Nos. 15-35018, 15-35179, 2017 WL 3122770, at *10 (9th Cir. July 24, 2017) (noting that filming a government operation in public is protected by the First Amendment), the Larsens provide no authority for the idea that there is a corollary First Amendment right to observe the wholly private activities of a non-governmental actor. Thus, even if the MHRA did somehow limit the Larsens' ability to attend the weddings of strangers, this would not implicate the First Amendment.

Instead, recognizing that application of the MHRA to expressive businesses in limited circumstances incidentally affects the content of the expressive product created for the customer, the Court applies the test set out in *O'Brien* to evaluate "content-neutral restrictions that impose an incidental burden on speech." *Turner*, 512 U.S. at 662.

### b.      Whether the MHRA Survives Intermediate Scrutiny

Applying *O'Brien*, the MHRA as applied to the Larsens easily passes constitutional muster.[24]   First, the MHRA furthers a state interest in preventing acts of invidious discrimination in the provision of goods and services provided to the public. The Supreme Court has characterized this interest as not merely "important or substantial," *O'Brien*, 391 U.S. at 377, but "compelling," *Roberts*, 468 U.S. at 628 (upholding the constitutionality of the MHRA).

Though the *Roberts* court upheld an earlier version of the MHRA, the subsequent addition of sexual orientation to the list of protected statuses does not lessen the compelling nature of the state's interest in preventing discrimination.   Indeed, the Minnesota Legislature enacted the MHRA only after Minnesota's Governor convened a Task Force on Lesbian and Gay Minnesotans ("Task Force") which "heard 25 hours of public testimony, 15 hours of private testimony and amassed over four inches of written

---

[24] Other than the three elements discussed here, *O'Brien* also listed a fourth requirement for content-neutral regulations incidentally burdening speech: that the law "is within the constitutional power of the Government."  *United States v. Tebeau*, 713 F.3d 955, 962 (8th Cir. 2013) (quoting *O'Brien*, 391 U.S. at 376-77).  There is no question that Minnesota had authority to enact the MHRA.  *Roberts*, 468 U.S. at 625 ("A State enjoys broad authority to create rights of public access on behalf of its citizens.").

materials." Geraldine Sell et al., Report of the Governor's Task Force on Lesbian and Gay Minnesotans 3 (1991), https://www.leg.state.mn.us/docs/pre2003/other/910436.pdf. The Task Force recommended enactment of a law banning discrimination based on sexual orientation after receiving "overwhelming" testimony demonstrating "that, as a group, gays and lesbians are the targets of considerable discrimination in the State of Minnesota." *Id.* at 5. The amendment to the MHRA adding sexual orientation as a protected characteristic was predicated on the conclusions of the Task Force.[25] Thus, the Court has no doubt that Minnesota has a compelling, and not just a substantial, interest in preventing invidious discrimination in public accommodations and contracting because of sexual orientation, and that interest is present in the context of businesses providing wedding-related services. *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2604 (2015) (recognizing "the right to marry is a fundamental right inherent in the liberty of the person").

The Larsens argue that because there are many other wedding video vendors in Minnesota who will gladly serve same-sex couples, same-sex couples will not be deprived of access to wedding video services if the Larsens do not provide them, and thus

---

[25] Articles and written testimony presented to the House Judiciary Committee during its consideration of the MHRA's 1993 amendment demonstrate that the Task Force report was the key research that the Minnesota Legislature considered when enacting that amendment. *E.g.*, Joint Religious Legislative Coalition, JRLC Position on Human Rights with Regard to Sexual Orientation 1-2 (1993); League of Women Voters Minnesota, Statement on HF 585 (1993) (submitting statement to the Minnesota House Judiciary Committee); Lee Bonorden, *Legislators Hear Opposition to Bill Protecting Gays*, Austin Daily Herald, Feb. 21, 1993, at 3A. These documents are in the publicly available Committee books from March 5, 1993, archived in Box 103.E.4.5(B); as public records, they are properly considered on a motion to dismiss.

the state's interest in preventing invidious discrimination is not implicated in this as-applied challenge. (*See* Am. Compl. ¶¶ 175-82.) But "[t]he promise of equality is not real or robust if it means you can be turned away." Louise Melling, *Religious Refusals to Public Accommodations Laws: Four Reasons to Say No*, 38 Harv. J. L. & Gender 177, 190 (2015). The Larsens' argument ignores the fact that an act of discrimination is harmful not merely because it might result in unequal access to goods or services, but also because the act itself "generates a feeling of inferiority as to [one's] status in the community." *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954).[26] "That stigmatizing injury, and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their [sexual orientation] as by those treated differently because of their race [or sex]." *Roberts*, 468 U.S. at 625. This legally-cognizable harm – "deprivation of personal dignity that surely accompanies denials of equal access to public establishments," *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964) – means that an antidiscrimination law fulfills its purpose when it reaches **all**, not simply **most**, public accommodations. Thus, the MHRA serves the compelling state interest of preventing invidious sexual orientation discrimination in public accommodations and contracting both in general and as applied to the Larsens' future wedding video business.

---

[26] In some instances, when resolving First Amendment issues, courts "can . . . find guidance in . . . equal protection cases." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (Kennedy, J., concurring).

Second, the Court considers whether the state's interest in preventing discrimination in contracting and public accommodations is "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. The Supreme Court has explained that the MHRA "reflects [Minnesota's] strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services. That goal . . . is unrelated to the suppression of expression . . . ." *Roberts*, 468 U.S. at 624 (citation omitted); *see also id.* at 628 (explaining that Minnesota's interest in preventing invidious discrimination is "wholly apart from the point of view such conduct may transmit"). Furthermore, when the Minnesota Legislature added sexual orientation to the list of protected statuses under the MHRA, it took pains to clarify that the amendment did not signify an official state policy "condon[ing]" various sexual orientations. *See* § 363A.27(1). The fact that the MHRA's application to expressive businesses may incidentally affect their speech does not change the fact that restricting free expression is neither the goal nor the primary function of the MHRA. Thus, the purpose of the challenged provisions – to provide Minnesota citizens equal access to contracting and public accommodations free from discrimination – is indeed "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377; *see also* § 363A.02 (describing Minnesota's public policy "to secure for persons in this state, freedom from discrimination").

Third, "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of" Minnesota's interest in preventing invidious discrimination. *Turner*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377). It

is clear that the state's purpose "would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689.  The challenged provisions only ban acts of discrimination that produce the harm the MHRA seeks to prevent, and "[t]he state's overriding compelling interest of eliminating discrimination . . . could be substantially frustrated if [a business selling services to the public], professing as deep and sincere religious beliefs as those held by [the Larsens], could discriminate against the protected classes." *McClure*, 370 N.W.2d at 853.  Thus, any incidental burden on the Larsens' speech caused by the Public Accommodations Provision is no greater than is essential to further the state's compelling interest.

The MHRA's application to the Larsens' wedding video business, as a content-neutral regulation of conduct with an incidental effect on speech, survives intermediate scrutiny.[27]

---

[27] The Court does not doubt that the challenged provisions, as applied to the Larsens' future wedding video business, would also survive strict scrutiny.  The state's interest in preventing invidious discrimination is compelling, as noted above.  The statute is also narrowly tailored, as it is only applicable to acts of invidious discrimination in public accommodations and contracting – the very harm the statute is meant to remedy.  The Court can conceive of no limiting construction or narrower rule that would not frustrate the statute's purpose to some degree.

While the Larsens ask the Court to carve out a "free speech exception" to the MHRA, such an undertaking would leave a gaping hole in antidiscrimination law for expressive businesses.  The fact that endorsing the Larsens' requested exception would leave many customers unprotected from invidious discrimination illustrates that the exception would not make the MHRA more narrowly tailored.  Instead, the proposed exception would amount to the Court privileging the rights of expressive businesses to avoid any and all incidental burdens on their speech-for-hire over the rights of customers to be free from discrimination – a compelling state interest.  The First Amendment simply does not compel this type of policy decision, which is better left to the Minnesota Legislature.

### 2. Whether the MHRA Implicates the Compelled Speech Doctrine

Next the Court considers Defendants' argument that the Larsens have failed to plead a plausible claim under the compelled speech doctrine. "[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld*, 547 U.S. at 61. The compelled speech doctrine limits the government's ability to force an individual to personally "speak the government's message." *Id.* at 63. Thus, the government may not forbid a driver from covering up the "Live Free or Die" message on a license plate, *Wooley v. Maynard*, 430 U.S. 705, 713, 717 (1977), or force students to recite the pledge of allegiance, *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The doctrine also limits the government's ability to force a speaker to "host or accommodate another speaker's message." *Rumsfeld*, 547 U.S. at 63. For example, unless strict scrutiny is satisfied, the government may not compel private parade organizers to allow specific banners to be carried in a parade, *Hurley*, 515 U.S. at 566, force a newspaper to provide space to a political candidate in the opinion section, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254-58 (1974), or require a utility company to send to customers printed information prepared by the company's critics, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 5-6, 9-18 (1986) (plurality opinion).

Where a business provides a "conduit" that allows others to pay for speech, strict scrutiny is usually unnecessary because there is "little risk" of compelled speech or that

the public will attribute the message to that of the speaker.[28]  *Id.* at 655.  Further, courts

generally do not find compelled speech where the speaker may easily disclaim the

message of its customers.[29]

The Court finds the MHRA, as applied to the Larsens' wedding video business,

does not implicate the compelled speech doctrine.  The law does not compel the Larsens

to speak a specific government message, unlike the message on the license plate in

*Wooley* or the words of the pledge of allegiance in *Barnette*.  The law does not dictate

how the Larsens carry out any of their creative decisions regarding filming and editing.

While the law does incidentally require wedding videographers to make videos they

---

[28] *Compare Turner*, 512 U.S. at 636, 655 (rejecting application of the compelled speech doctrine when a law required cable operators "to set aside a portion of their channels for local broadcasters," in part because, "[g]iven cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator"), *and Rumsfeld*, 547 U.S. at 65 (finding that a school's hosting of recruiters was unlikely to constitute compelled speech because students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so"), *with Hurley*, 515 U.S. at 577 (explaining that in the context of banners in a parade, "the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole," such that it was likely that viewers would attribute messages on banners in the parade to the parade organizers).

[29] *Compare PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 86-88 (1980) (upholding a state law granting members of the public the right to exercise their speech rights in a privately owned shopping center, reasoning that the law did not unconstitutionally compel the shopping mall to host the speech of another, because "[t]he views expressed by members of the public . . . will not likely be identified with those of the owner," and further noting that the mall could put up signs disclaiming sponsorship of the protesters' message), *with Hurley*, 515 U.S. at 576 (finding that "there is no customary practice whereby private sponsors disavow 'any identity of viewpoint' between themselves and the selected participants," in a parade, and therefore, parade organizers could not easily disclaim ownership of the message communicated by the participants' banner).

might not want to make, the concerns undergirding the application of the compelled speech doctrine to instances of hosting another's message are immaterial.

First, speech-for-hire is commonly understood to reflect the views of the customer.[30] Weddings are expressive events showcasing the messages and preferences of the people getting married and attendees, who do things like speak, dress, and decorate in certain ways. A video of a wedding depicts this expressive event, and while videographers may exercise creative license to fashion such a video, the videographer is a "conduit" for communication of the speech and expression taking place at the wedding. *Turner*, 512 U.S. at 628-29 (noting that while cable operators do engage in and transmit speech, and thus are "entitled to the protection of the speech and press provisions of the First Amendment," when a cable operator selects channels to carry, they "function[], in essence, as a conduit for the speech of [those who produce television programs and sell or license them to cable operators]"). Thus, when a person views a wedding video, there is little danger that they would naturally attribute the video's messages to the videographer. *Matter of Gifford v. McCarthy*, 137 A.D.3d 30, 42 (N.Y. App. Div. 2016) ("[R]easonable

---

[30] The Larsens have not provided any caselaw in which a court applied the compelled speech doctrine to a business selling speech-for-hire, and the Court is unaware of any such cases. "The cases in which the United States Supreme Court found that the government unconstitutionally required a speaker to host or accommodate another speaker's message are distinctly different because they involve direct government interference with the speaker's own message, as opposed to a message-for-hire." *Elane Photography*, 309 P.3d at 66.

observers would not perceive . . . provision of a venue and services for a same-sex wedding ceremony as an endorsement of same-sex marriage.").[31]

Second, the Larsens can easily disclaim personal sponsorship of the messages depicted in the wedding videos they create for clients. For example, the Larsens could post language on their website stating that while they follow applicable law, and thus serve couples regardless of protected status, they are opposed to same-sex marriage. The simple ability to disclaim support for same-sex marriage sets this case apart from *Hurley*, where there was not a practicable way to disclaim support of participants' messages in the context of a moving parade. *See* 515 U.S. at 576-77.

Third, a major concern in the compelled speech cases is the notion that if a speaker is required to host the message of another, this will inhibit the speaker's ability to communicate his or her own preferred message. *E.g.*, *Tornillo*, 418 U.S. at 256-57. The Larsens' planned wedding video business does not raise this concern, as the MHRA would leave the Larsens free to only publicize videos of opposite-sex weddings and to affirmatively communicate their views to the public in any manner they prefer.

---

[31] The Larsens' reliance on *Claybrooks v. American Broadcasting Cos.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012), is misplaced. In that case, a district court upheld the First Amendment rights of television producers to make race-based casting decisions. *Id.* at 1000. But in a television show, the producer controls the content of the events being filmed, while in a video depicting a wedding, there is no "casting" on the part of the videographer, and the customer makes the creative choices regarding the details of the wedding. While the Larsens allege that they make creative decisions about their videos, including lighting, what footage to include, music, etc., (*e.g.*, Am. Compl. ¶¶ 91, 93, 100, 104-07), the Court does not understand the Larsens to be alleging that they make wedding planning decisions for their customers regarding, for example, what words will be spoken during the wedding or who will speak them. Selecting customers as a public accommodation is simply unlike casting for a television show.

For these reasons, the Court concludes the MHRA need not be subjected to strict scrutiny because the statute, as applied, does not implicate the compelled speech doctrine.

### 3.    Unbridled Discretion

The Larsens allege that the MHRA is not viewpoint-neutral because it grants Defendants unbridled enforcement discretion.    The Larsens further allege that "Defendants have wielded this unbridled discretion to punish disfavored views concerning the topic of marriage" by taking the view that a religious objection to same-sex marriage is not a legitimate business purpose, while lack of time or skill is a legitimate business purpose.  (Am. Compl. ¶¶ 216-17.)

The Larsens cite caselaw regarding time, place, and manner restrictions on expression that amount to prior restraints.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (discussing "the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship"). The MHRA is a regulation of conduct with incidental burdens on speech that arise in very narrow circumstances; it is not a licensing statute imposing a prior restraint on speech in a public forum, unlike the prior restraints in the cases provided.  *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 318, 323-24 (2002) (relating to the permitting process for public assemblies); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 124, 132-33 (1992) (same); *City of Lakewood*, 486 U.S. at 752-53, 769-72 (regarding a licensing requirement for placement of newspaper racks in public locations); *Roach v. Stouffer*, 560

F.3d 860, 869-70 (8th Cir. 2009) (concerning applications for specialty license plates). For this reason alone, the Court finds the Larsens' prior restraint claim fails as a matter of law.

Even if the Larsens' unbridled discretion claim were cognizable, it would still fail as a matter of law. The Larsens argue that because the statute does not define the term "legitimate business purpose," this term grants Defendants unbridled discretion to enforce the MHRA in a manner that is not viewpoint-neutral. The key inquiry in determining whether a statute grants unbridled enforcement discretion is whether the statute provides "narrowly drawn, reasonable and definite standards," as opposed to leaving decisions to be made at "the whim of the administrator." *Chi. Park Dist.*, 534 U.S. at 324 (quoting *Forsyth County*, 505 U.S. at 133).

Instead of setting a vague or meaningless standard giving rise to unbridled enforcement discretion, the concept of a "legitimate business purpose" is heavily-trodden ground; the standard is used widely in antidiscrimination law as well as in other contexts in Minnesota law.[32] The Supreme Court approved of the "legitimate nondiscriminatory reason" standard in the *McDonnell-Douglas* burden-shifting framework in 1973.

---

[32] *E.g.*, Minn. Stat. §§ 325E.59, subd. 1(b), 609.821, subd. 2(4); *Hubbard Cty. Health & Human Servs. v. Zacher*, No. A08-2172, 2009 WL 3364256, at *4-5 (Minn. Ct. App. Oct. 20, 2009) (considering, in a child support case, whether a father retained earnings for a legitimate business purpose); *Walters v. Demmings*, No. C4-01-2, 2001 WL 641753, at *2-3 (Minn. Ct. App. June 12, 2001) (citing *Parkin v. Fitzgerald*, 240 N.W.2d 828, 832 (Minn. 1976)) (considering whether an eviction was motivated by a legitimate business purpose); *Harris v. Mardan Bus. Sys., Inc.*, 421 N.W.2d 350, 353 (Minn. Ct. App. 1988) (finding no violation of a fiduciary duty when the defendant could demonstrate a legitimate business purpose for his action).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (asking whether an employer accused of unlawful discrimination provided a "legitimate, nondiscriminatory reason" for its actions); *see also, e.g.*, *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir. 1982) (discussing the burden-shifting *McDonnell-Douglas* standard using the term "legitimate business purpose"); *Williams v. Boorstin*, 663 F.2d 109, 116-17 (D.C. Cir. 1980) (similar); *Boyd v. Madison Cty. Mut. Ins. Co.*, 653 F.2d 1173, 1178 (7th Cir. 1981) (similar).

The Minnesota Legislature's use of the term "legitimate business purpose" did not occur in vacuum. The Supreme Court decided *McDonnell Douglas* more than fifteen years before Minnesota added the relevant language to the MHRA. Act of May 3, 1990, ch. 567, 1990 Minn. Laws 1738, 1746 (codified as amended at Minn. Stat. §§ 363A.01-363A.44) (adding the Business Discrimination Provision and the term "legitimate business purpose"). At the time of the amendment, Minnesota courts already applied the *McDonnell-Douglas* test to evaluate MHRA claims. *See Danz v. Jones*, 263 N.W.2d 395, 398-400 (Minn. 1978); *see also Sigurdson v. Isanti County*, 386 N.W.2d 715, 720 (Minn. 1986) (explicitly using the term "legitimate business purpose" in the context of the *McDonnell-Douglas* test). Given the preexisting, widespread use of the "legitimate business purpose" concept, the MHRA's use of the term does not grant Defendants unbridled discretion to enforce the statute in a viewpoint-discriminatory way.

To summarize, the Court concludes that the MHRA as applied to the Larsens' future wedding video business is a content-neutral regulation of conduct that occasionally incidentally burdens expression that survives intermediate scrutiny. The law does not

implicate the compelled speech doctrine, nor does it amount to a prior restraint granting Defendants unbridled discretion. For these reasons, the law does not violate the Larsens' free speech rights.

## C. Count II: Expressive Association

In Count II of the Amended Complaint, the Larsens argue that the MHRA violates their First Amendment right of expressive association. (Am. Compl. ¶¶ 228-44.) Defendants move to dismiss Count II on the grounds that the act of serving customers is not expressive association protected by the First Amendment, and even if there is some burden on associational rights, that infringement is constitutional because the statute survives strict scrutiny.

"[I]mplicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express. Thus, '[f]reedom of association . . . plainly presupposes a freedom not to associate.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (alterations in original) (quoting *Roberts*, 468 U.S. at 623). "But the freedom of expressive association, like many freedoms, is not absolute. [The Supreme Court has] held that the freedom could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that

cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* (quoting *Roberts*, 468 U.S. at 623).

The Larsens argue that their relationship with wedding video customers is an expressive association because the Larsens' alleged purpose in operating as a public accommodation is to express their own religious message about marriage. They further allege that the MHRA, as applied to their wedding video business, unconstitutionally infringes on their expressive association rights.

Even assuming that the act of associating with a customer, when the business provides an expressive service, could be considered an "expressive association,"[33] the Larsens' claim fails as a matter of law. As stated above, the MHRA "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Dale*, 530 U.S. at 688 (quoting *Roberts*, 468 U.S. at 623). "Even if the [MHRA] does work some slight infringement on [the Larsens'] right of expressive association, that infringement is

---

[33] The Court highly doubts that the relationship between a public accommodation and a customer could be considered "expressive association." *See Rumsfeld*, 547 U.S. at 69 ("[A] speaker cannot 'erect a shield' against laws requiring access 'simply by asserting' that mere association 'would impair its message.'" (quoting *Dale*, 530 U.S. at 653)); *see also Hishon* 467 U.S. at 78 ("[I]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973))). Applying the MHRA to the Larsens "does not force [TMG] 'to accept members it does not desire,'" *Rumsfeld*, 547 U.S. at 69 (quoting *Dale*, 530 U.S. at 648), because TMG does not have "members." And as discussed above, serving same-sex customers does not inhibit the Larsens' ability to carry out their expressive goal of communicating their own views about marriage. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548-49 (1987).

justified because it serves the State's compelling interest in eliminating discrimination [based on sexual orientation]."  *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987).  For this reason, the Court will grant Defendant's motion to dismiss the Larsens' expressive association claim.

### D.     Count III: Free Exercise

In addition to their free speech and expressive association claims, the Larsens also allege that the MHRA violates their First Amendment right to freely exercise their religion.  (Am. Compl. ¶¶ 245-75.)  Defendants move to dismiss this claim, arguing that the MHRA does not unconstitutionally limit the Larsens' free exercise of religion because it is a neutral law of general applicability.

The First Amendment's Free Exercise Clause, applicable to the states through the Fourteenth Amendment, prohibits states from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).   Laws burdening the free exercise of religion, as opposed to neutral, generally-applicable laws incidentally burdening religious exercise, must be narrowly tailored to advance a compelling government interest.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993).  "A law is not neutral if its object is 'to infringe upon or restrict practices because of their religious motivation.'"  *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 533).  "Absent evidence of an 'intent to regulate religious worship,' a law is . . . neutral . . . ."  *Id.*

(quoting *Cornerstone Bible Church v. City of Hastings*, 948 F.3d 464, 472 (8th Cir. 1991)). A law is not generally applicable if "in a selective manner[, it] impose[s] burdens only on conduct motivated by religious belief." *Church of the Lukumi Babalu Aye*, 508 U.S. at 543.

The MHRA is a neutral law of general applicability. *See McClure*, 370 N.W.2d at 851. First, the law is facially neutral toward religion. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face."). There is also no indication that the object of the MHRA's sexual orientation provisions is to infringe upon the free exercise of religion; indeed, the legislative history discussed in detail above demonstrates that the object of the law is to remedy invidious discrimination in contracting and public accommodations writ large. And the law affects all discriminatory acts carried out in public accommodations and contracting, whether motivated by religion or something else. The MHRA does not "fail to prohibit nonreligious conduct that endangers [Minnesota's] interests" in preventing invidious discrimination. *Id.* at 543. Therefore, the MHRA is generally applicable.[34]

---

[34] The Larsens argue that the MHRA's exemptions for religious associations, *see* § 363A.26, and for gendered restrooms and gendered youth sports teams, *see* § 363A.24, are evidence that the law is not generally applicable. But neither exemption evinces a lack of general applicability. The Supreme Court "has long recognized that the government may . . . accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987). And the exemptions for restrooms and sports teams are narrow and have nothing to do with religion; they simply are not evidence that the law is not generally applicable.

Because the MHRA is a neutral, generally-applicable law that is rationally related to a legitimate government interest, the Larsens' Free Exercise claim fails as a matter of law.[35]

### E.     Count IV: Unconstitutional Conditions Doctrine

In Count IV of the Amended Complaint, the Larsens allege that the MHRA, as applied, violates the unconstitutional conditions doctrine.   (Am. Compl. ¶¶ 276-82.) Defendants move to dismiss this claim because the Larsens have not alleged the denial of a government benefit, and even if the doctrine does apply, the condition that the MHRA imposes – that businesses providing services to the public may not discriminate against customers based on sexual orientation – is constitutional.

Under the unconstitutional conditions doctrine, the government "may not deny a benefit to a person on a basis that infringes his [or her] constitutionally protected interests—especially, his [or her] interest in freedom of speech."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).   The Larsens' unconstitutional-conditions claim fails as a matter of law because the Larsens have not alleged the denial of a government benefit. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2329-32

---

[35] The Larsens ask the Court to recognize the so-called "hybrid rights" doctrine – that is, application of "stricter scrutiny for hybrid situations [involving the Free Exercise Clause in conjunction with other constitutional claims] than for a free exercise claim standing alone." *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003).  The cases discussing this theory rely on Supreme Court dicta, *see id.*, and the Eighth Circuit has never squarely adopted the doctrine, *see Mukasey*, 541 F.3d at 832; *Cornerstone Bible Church*, 948 F.2d at 472-73.   The Court declines to do so here.  *See Church of the Lukumi Babalu Aye*, 508 U.S. at 566-67 (Souter, J., concurring) (discussing problems with the so-called "hybrid rights" doctrine).

(2013) (receipt of government funds); *Bd. of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 678-80 (1996) (renewal of government contract); *Rust v. Sullivan*, 500 U.S. 173, 197-200 (1991) (receipt of government funds); *Perry*, 408 U.S. at 596-98 (government employment).

The Larsens argue that the unconstitutional conditions doctrine applies not only when a government benefit is at stake, but also when the exercise of one's constitutional right is conditioned on forfeiting another constitutional right. In this case, the Larsens argue they have a constitutional right to work in the wedding video business as a public accommodation, but their ability to do so is conditioned on forfeiting their First Amendment right not to make videos of same-sex weddings, as an element of their alleged right "to follow a chosen profession free from unreasonable governmental interference." *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977) (striking down a law requiring officers of political parties to waive the constitutional right against self-incrimination in order to exercise their First Amendment right to "participate in private, voluntary political associations").

Even if there could be a cognizable unconstitutional conditions claim in the absence of an alleged denial of a government benefit, the Court sees the Larsens' claim as a repackaging of their Free Speech claims, and the Court similarly repackages its resolution of those claims: while the creation of speech-for-hire may be imbued with First Amendment significance, the incidental burden the MHRA places on the Larsens' free speech is not unconstitutional because the law survives the *O'Brien* test. Calling that

burden an "unconstitutional condition" does not change this outcome. *See Rumsfeld*, 547 U.S. at 60 ("Because the First Amendment [does] not prevent [Minnesota] from directly imposing [the MHRA's antidiscrimination requirement], the statute does not place an unconstitutional condition on [the Larsens' alleged right to engage in their chosen profession].").

For these reasons, the Court will grant Defendant's motion to dismiss Count IV in the Amended Complaint.

### F. Count V: Equal Protection[36]

In Count V of the Amended Complaint, the Larsens allege that the MHRA, as applied, violates the Equal Protection Clause of the Fourteenth Amendment. (Am. Compl. ¶¶ 283-95.) Defendants argue that this claim must fail because the Larsens have failed to allege that they are treated differently than similarly-situated individuals, that the Larsens are part of a suspect class, or that the MHRA burdens the Larsens' fundamental rights. Defendants also argue that even if the law implicated equal protection concerns, it is constitutional because it survives strict scrutiny.

---

[36] Defendants argue that *United States v. Salerno*, 481 U.S. 739 (1987), applies to the Larsens' equal protection and due process claims to the extent the Larsens assert facial challenges. *Salerno* requires that to succeed on a facial challenge to a legislative act, "the challenger must establish that no set of circumstances exists under which the [law] would be valid." *Id.* at 745. It is well-recognized that *Salerno* does not apply to overbreadth claims brought under the First Amendment free speech clause. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 618-19 (1998) (Souter, J., dissenting). The Court need not resolve this issue as to the Larsens' equal protection claim because it is an as-applied challenge.

The Fourteenth Amendment prohibits states from "deny[ing] to any person within [a state's] jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause requires courts to review with heightened or strict scrutiny state laws that either (1) discriminate on the basis of a suspect class or (2) deny fundamental rights to some groups but not others. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

The Larsens do not argue that the MHRA discriminates on the basis of a protected class, and it plainly does not. Instead, the Larsens posit that the MHRA treats similarly-situated individuals differently in the exercise of their fundamental right to free speech. *See Ganley v. Minneapolis Park & Recreation Bd.*, 491 F.3d 743, 747 (8th Cir. 2007) ("In general, the Equal Protection Clause requires that state actors treat similarly situated people alike." (quoting *Bogren v. Minnesota*, 236 F.3d 399, 408 (8th Cir. 2000))). The Larsens propose that they are similarly situated to other Minnesota wedding videographers who want to create wedding videos "consistent with their religious, political, or social beliefs." (Pls.' Opp. at 37.) The Larsens argue that, unlike others similarly situated, the Larsens are (1) prevented from "creating films that express messages consistent with their beliefs about marriage,"[37] (*id.*), and (2) forced to create films they disagree with (*see id.* at 38).

---

[37] As stated above, the MHRA does not prevent the Larsens from creating films, so the Court rejects this argument.

The Larsens' proposed grouping of similarly-situated individuals is unlike any the Court has encountered in precedent: they posit that what makes them similar to other videographers is a desire to express their personal beliefs, or one could say, a desire to express differences. The Court rejects this characterization of what makes people similarly situated. Here, the MHRA clearly applies in exactly the same way to all similarly-situated individuals – all videographers operating as public accommodations must serve all customers regardless of protected status. Because the Larsens have not alleged that they are treated differently than similarly-situated individuals, they have failed to allege a cognizable equal protection claim.[38]

## G.     Count VI: Procedural Due Process

In Count VI of the Amended Complaint, the Larsens allege that the term "legitimate business purpose," as used in the Business Discrimination Provision, is unconstitutionally vague in a manner that violates their right to procedural due process. (Am. Compl. ¶¶ 296-307.) Defendants move to dismiss this claim on the grounds that the term "legitimate business purpose" is not unconstitutionally vague

---

[38] Even if the MHRA did implicate equal protection concerns, the Court finds the law would survive strict scrutiny because it is narrowly tailored to serve a compelling government interest. *See Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003) (explaining that statutes subject to strict scrutiny under the Equal Protection Clause are only constitutional if they are narrowly tailored to support a compelling government interest, and noting that "strict scrutiny is rigorous but not always 'fatal in fact'" (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)).

The void-for-vagueness doctrine, which stems from the Fourteenth Amendment Due Process Clause, "reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Roberts*, 468 U.S. at 629 (alteration in original) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). When the literal scope of a law is as written "is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308-09 (8th Cir. 1997) (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)).

The Larsens argue that the Business Discrimination Provision's use of the term "legitimate business purpose" is unconstitutionally vague, both facially and as applied;[39] the Court disagrees. As explained above, the phrase "legitimate business purpose" has a commonly-understood meaning in antidiscrimination law, and thus it does not grant enforcement officials unbridled discretion to penalize views they disagree with. Furthermore, persons of common intelligence can distinguish between legitimate

---

[39] The Larsens provide the following example to demonstrate their position that the term "legitimate business purpose" is unconstitutionally vague: "Defendants have categorically declared that an expressive business that declines to create speech promoting same-sex marriages based on a religious objection to such marriages is not acting with a 'legitimate business purpose' and thus not exempt, yet that same business would be acting with a 'legitimate business purpose' and thus exempt if it declined a same-sex marriage request because it did not have sufficient time or the requisite skill." (Am. Compl. ¶ 302.)

business purposes, related to the functions of operating a business,[40] and other purposes. Based on the plain meaning of the words "legitimate business purpose," members of the public generally understand that a religiously-motivated desire to discriminate based on a protected status is not a legitimate business purpose, since this reason has nothing to do with business operations. *Cf. EEOC v. Tree of Life Christian Schs.*, 751 F. Supp. 700, 707-09 (S.D. Ohio 1990) (rejecting a Christian school's argument that "giving witness to a religious belief" that resulted in sex-based discrimination in pay was a "legitimate business reason," even when the school took the position that its "'business' [was] 'nothing more than the practice of religion'"). In contrast, the public generally understands that lack of time or skill to complete a customer's request as a legitimate business reason to decline a customer's request, since this reason relates to the functions involved in operating a business.

Because the Business Discrimination Provision is not unconstitutionally vague, the Larsens' procedural due process claim fails as a matter of law.

### H. Count VII: Substantive Due Process

---

[40] *See, e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (explaining that a legitimate business purpose might be related to "'the employer's legitimate interest in efficient and trustworthy workmanship'" (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975))); *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 31 (1967) (listing the following potential legitimate business purposes: "(1) to reduce expenses; (2) to encourage longer tenure among present employees; or (3) to discourage early leaves immediately before vacation periods"); *Branson Label*, 793 F.3d at 919 (referring to "administrative convenience" as a legitimate business purpose).

Lastly, in Count VII of the Amended Complaint, the Larsens allege that the MHRA violates a number of their fundamental rights, and thus, the law is unconstitutional as applied under the theory of substantive due process. Defendants move to dismiss this claim because it is a repleading of the Larsens' First Amendment claims and the Larsens' have otherwise failed to allege the violation of a fundamental right.

In order to plead a cognizable substantive due process claim, among other things, a plaintiff must plead the violation of a fundamental right. *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017). "For purposes of substantive due process analysis, fundamental rights are those 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005)).

The Larsens claim that the MHRA's requirement that they serve same-sex couples in their wedding video business violates a number of fundamental rights. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, to the extent the Larsens' substantive due process claim is an objection to the incidental burden on their free speech posed by the MHRA, this claim fails as a matter of law because it is repleading their free speech claim. And to the extent

the substantive due process claim is an objection to the incidental burdens the MHRA places on their ability to live out their own personal identities and beliefs as defined by their religion, this claim fails as a matter of law because it is, in reality, a free exercise claim.

The Larsens also argue for the constitutional recognition of a number of work-related fundamental rights, including the rights "to pursue one's entrepreneurial dreams, engage in the common occupations of life, operate a business, earn a livelihood, . . . continue employment unmolested," and "engage in [one's] business in a way that is consistent with [one's] own concepts of existence and identity."[41] (Am. Compl. ¶¶ 311, 316.)

"The day is gone when [courts] use[] the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955). Neither the Supreme Court nor the Eighth Circuit has recognized that there is a fundamental right to work or operate a business free from regulations that one dislikes. *Cf. Doe v. Rogers*, 139 F. Supp. 3d 120, 156 & n.23 (D.D.C. 2015) (noting that "numerous federal circuit courts have concluded that the right to engage in a chosen profession is not a fundamental right" and collecting cases). Absent some authority to the contrary, the Court declines to

---

[41] The MHRA does not prevent the Larsens from participating in the economy or earning a livelihood.

expand the reach of substantive due process on these facts, as the doctrine is "reserved for truly egregious and extraordinary cases." *Myers v. Scott County*, 868 F.2d 1017, 1018 (8th Cir. 1989); *see also Albright*, 510 U.S. at 271-72 ("As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992))).

Because the Larsens have failed to plead the violation of a fundamental right, and because their First Amendment arguments are not cognizable under the rubric of substantive due process, the Larsens' substantive due process claim fails as a matter of law.

Defendants have met their burden to demonstrate that Counts I-VII in the Amended Complaint all fail as a matter of law. The MHRA does not violate the Larsens' First Amendment speech, association, or free-exercise rights. Nor does the MHRA implicate the unconstitutional conditions doctrine. The Larsens' Fourteenth Amendment claims also fail because the Larsens have not alleged that they are treated differently than similarly-situated individuals, they have not alleged the infringement of a fundamental right, the MHRA is not unconstitutionally vague, and their First Amendment-related claims are not separately cognizable under the rubric of substantive due process. For these reasons, the Court will grant Defendant's Rule 12(b)(6) motion and enter judgment against the Plaintiffs.

## III. MOTION FOR PRELIMINARY INJUNCTION

Because the Court will grant Defendants' motion to dismiss the Amended Complaint in its entirety, the Court will deny as moot the Larsens' motion for preliminary injunction.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Defendants Kevin Lindsey and Lori Swanson's Motion to Dismiss [Docket No. 31] is **GRANTED**.  All claims against Defendants are **DISMISSED with prejudice.**

2.      Plaintiffs Carl and Angel Larsen and Telescope Media Group's Motion for Preliminary Injunction [Docket No. 14] is **DENIED as moot.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 20, 2017            _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                            Chief Judge
                                              United States District Court